J-S05017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: M.M.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M.A., MOTHER | : | No. 1120 WDA 2023 |

Appeal from the Order Entered August 14, 2023
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): No.29 In Adoption 2023

BEFORE: PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED: April 5, 2024**

Appellant, C.M.A. ("Mother"), appeals from the order entered in the Erie County Court of Common Pleas, which involuntarily terminated her parental rights to M.M.A. ("Child"). We affirm.

The relevant facts and procedural history of this case are as follows. Mother and J.A. ("Father") were never married although they lived together between 2017 and 2019. Child was born in June 2018. When the parties separated, Father and Child moved to paternal grandparents' home. Mother and Father initially shared custody.

In 2020, Child exhibited several unexplained injuries. A police investigation ensued after authorities determined that at least one of the injuries, "manifesting as severe bruising and pinch marks consistent with being dragged by the ear," had occurred when Child was in Mother's exclusive

physical custody. (*See* Trial Court Opinion, filed 10/24/23, at 2). A medical review board determined that the injuries were the result of child abuse and, in August 2020, Mother was charged in connection with Child's injuries.[1] Father filed for a Protection from Abuse ("PFA") petition on behalf of Child, which Mother consented to, and the court issued the PFA on November 5, 2020. Mother has not had any contact with Child since the PFA was issued, nor has she filed for custody.

On March 21, 2023, Father filed a private petition for involuntary termination of Mother's parental rights. On March 27, 2023, the court appointed Deanna Heasley, Esquire, to represent Child. On May 12, 2023, A.F.A., Child's stepmother ("Stepmother") filed a petition for adoption. The court originally scheduled the hearing on Father's termination petition on May 18, 2023; however, after Mother retained counsel to represent her, the court granted Mother's motion for a continuance.

The court ultimately held the termination hearing on August 8, 2023, with the stated goal of determining "whether [Mother's] admitted absence from [Child's] life for well over six months prior to the [termination] petition was the result of one or more insurmountable obstacles such that [Mother's] failure to perform parental duties should be excused under Section 2511(a)(1)." (Trial Court Opinion at 2). The court also decided that Attorney

---

[1] Mother pled no contest to one count of harassment, a third-degree misdemeanor, in August 2022.

- 2 -

Heasley had no conflict of interest in representing Child's legal and best interests.[2] At the close of the hearing, the court found that Father had proven by clear and convincing evidence that Mother's conduct had evidenced a settled purpose of relinquishing a parental claim, Mother's inaction was not caused by insurmountable obstacles, and it was in Child's best interest to terminate Mother's parental rights.

The court entered its final order terminating Mother's parental rights on August 14, 2023. Mother filed a timely notice of appeal on September 13, 2023. She filed her concise statement of errors complained of on appeal on October 6, 2023.[3]

_____

[2] During the termination hearing, Attorney Heasley stated that Child's legal and best interests were the same. She noted that Child stated to Stepmother, "I want to call you real mama," which Attorney Heasley explained, as a five-year-old, is an indication of his legal interests. (*See* N.T. Hearing, 8/8/23, at 96). The court found Child's interests did not conflict, and accordingly, permitted Attorney Heasley to represent Child's best and legal interests during the termination hearing. *See In re Adoption of K.M.G.*, 663 Pa. 53, 240 A.3d 1218 (2020) (holding that trial court must determine in first instance whether counsel can represent dual interests before appointing individual to serve as guardian *ad litem* and legal counsel for child, and appellate court review is limited to determining that counsel was appointed and that if same counsel was appointed to serve both interests, that trial court made such determination in first instance); *In the Interest of H.H.N.*, 296 A.3d 1258 (Pa.Super. 2023) (holding where child's legal and best interests do not diverge in termination proceeding attorney-guardian *ad litem* representing child's best interests can also fulfill role of attorney under 23 Pa.C.S.A. § 2313(a) to represent child's legal interests).

[3] Mother failed to file her concise statement of errors together with her notice of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Nevertheless, we decline to find waiver of Mother's issues or dismiss the appeal on this basis. *See In re*
*(Footnote Continued Next Page)*

Mother raises the following issues on appeal:

1. Did the trial court err as a matter of law in concluding that [Mother] failed to perform parental duties for at least six months prior to the filing of the petition by failing to act in a reasonable manner to overcome the obstacles in place when considering her specific obstacles and analyzing the reasonable firmness by which [Mother] acted to overcome those obstacles?

2. Did the trial court err as a matter of law when the trial court treated a [PFA] Order protecting a child the same as a [PFA] Order protecting a coparent?

3. Did the trial court err in concluding that the Father did not create obstacles impeding Mother's ability to maintain a relationship with the Child when the Father failed to contact Mother about Counseling or therapy services provided to the Child?

4. Did the trial court err as a matter of law in concluding that it is in the Child's best interest to terminate the relationship with Mother?

(Mother's Brief at 4-5).

In her first three issues combined,[4] Mother asserts that she initially stopped exercising her custodial time with Child during the pendency of the child abuse investigation because Mother felt that it would be in Child's best interest to remain with Father rather than to have him placed in foster case. Thereafter, Mother claims there were numerous obstacles which impeded her

_____

***K.T.E.L.***, 983 A.2d 745 (Pa.Super. 2009) (explaining that failure to file Rule 1925 statement concomitantly with notice of appeal in children's fast track case is considered defective notice of appeal, which this Court can overlook).

[4] In her brief, Mother grouped her discussion of these issues into one argument section. We similarly address these issues together.

involvement with Child including the child abuse investigation, criminal charges that were filed against her, and the PFA order. Mother maintains that "[a]ddressing the criminal charges became the focal point" until August 30, 2022, when she entered a no contest plea in that case. (Mother's Brief at 7). Mother emphasizes that she attended anger management and parenting courses, and that her plea of no contest does not indicate her as a perpetrator of child abuse. (*Id.* at 14). After addressing the criminal charges, Mother contends that she sought to hire an attorney to address the PFA and custody situation, but she could not afford one. Moreover, Mother highlights that the attorneys with whom she spoke told her that she could not do much about custody until the PFA terminated in November 2023.

In addition, Mother argues that Father created some obstacles for Mother by failing to contact her and keep her appraised of Child's appointments and medical treatment. Mother claims that the PFA did not preclude contact between Father and Mother relating to her legal custody, and Father should have kept her appraised of appointments and treatments so that she could have taken part in Child's welfare. Mother concludes that her failure to perform parental duties was caused by insurmountable obstacles, and the court erred and abused its discretion when it terminated her parental rights. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights. The time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support. We readily comprehend the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child. For these reasons, the burden of proof is upon the party seeking termination to establish by clear and convincing evidence the existence of the statutory grounds for doing so. [C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. Because of this serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights be based solely on competent evidence.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, [w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent

evidence.

***In re Adoption of C.M.***, \_\_\_ Pa. \_\_\_, \_\_\_\_, 255 A.3d 343, 358-59 (2021)

(internal citations and quotation marks omitted).

Father filed a petition for the involuntary termination of Mother's

parental rights to Child on the following ground:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), and (b).

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or

failure to perform parental duties. In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of …her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

Instantly, Child has not had contact with Mother since November 2020. Father filed his involuntary termination petition approximately 28 months later, on March 21, 2023. During the 28-month period, Mother did not file a

child custody action seeking custody of or visitation with Child. Although Mother claims that she thought she was precluded from filing for custody while there was an active PFA order, the trial court explained:

> There is no law preventing a PFA defendant from filing a child custody action, regardless of who is the protected party under the order or whether the order is entered by consent or after a hearing on the merits. In fact, the Child Custody Act expressly contemplates that parties with PFA, abuse, and/or criminal records may be parties to custody actions. For example, 23 Pa.C.S.A. § 5328(a)(2) requires the custody court to consider "[t]he present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child." Section 5329 of the Custody Act requires the court to specifically "consider [certain enumerated criminal offenses] and determine that the party does not pose a threat of harm to the child before making any order of custody to that party." 23 Pa.C.S.A. § 5329. And Section 5329.1 requires the trial court to determine whether and to what extent a child or child custody litigant has been involved with child protective services. 23 Pa.C.S.A. § 5329.1. Further, the PFA rules specifically require temporary and final PFA orders to include language to the effect that: "The custody provisions of Paragraph 5 of this order are temporary. Either party may initiate custody proceedings pursuant to the custody statute at 23 Pa.C.S. §§ 5321-5340. Any valid custody order entered after the final Protection from Abuse order supersedes the custody provisions of this order." Pa.R.Civ.P. 1905(c) and (e), form ¶ 5.
>
> Nothing in these laws distinguishes between consent and contested PFA orders. Further, the above cited portion of Rule 1905(c) and (e) directly contradicts [Mother's] argument by declaring, without limitation, that custody provisions within temporary and final PFA orders are temporary and can be modified by filing a custody action.
>
> Thus, while the circumstances underlying a party's PFA, abuse and/or criminal history may have serious, even

determinative effects on the outcome of a custody action, there is nothing in the law that requires, or even permits, *per se* disqualification of a child custody action based on the filer's PFA, abuse, and/or criminal history. Instead, the Custody Act affords the trial court with broad discretion to fashion appropriate custody orders to protect children from potentially dangerous parties, such as court-ordered therapeutic intervention, supervised visitation, and professionally guided reunification counseling to name just a few.

Regarding the second component to [Mother's] argument, that regardless of the law [Mother] believed she was precluded from filing for custody for various reasons, the court heard all of her testimony and did not find her credible. [Mother] testified that she believed she could not have any contact with [Child] until the PFA expired in 2023, and that was the reason, or one of the reasons, she did not pursue a child custody action over the past two and a half years. (***See e.g.*** [N.T. Hearing, 8/8/23, at] 70). But, she also contradicted herself by admitting that she consulted with an attorney about initiating custody proceedings "before I had gotten my public defender for my criminal cases" and that the attorney she talked to "wanted a thousand dollars to do the custody paperwork and modification and I couldn't afford it." ([***Id.*** at] 65). A temporary PFA Order was granted October 29, 2020. The final PFA order was entered November 5, 2020. Thereafter, [Mother] had no further custodial time with the child. ([***Id.*** at] 43-44). A public defender was assigned in her criminal case on November 23, 2020, according to the criminal docket at No. 2445 of 2020. Accordingly, [Mother's] testimony reveals that sometime after the PFA Orders were entered in late October and early November 2020, but before her public defender was appointed later in November of 2020, [Mother] was aware through contact with an attorney that she could pursue a child custody action, and she declined those services for strategic and financial reasons.

Also, when confronted on cross-examination with the PFA Order's instruction that "[e]ither party may initiate custody proceedings...[and] [a]ny valid custody order entered after the final [PFA] order supersedes the custody provisions of this order," [Mother] responded that she did not "bother" to

- 10 -

read the orders ([*id.* at] 70), and regardless, she elected to pursue a different "plan of attack" by defending against her criminal charges first, then resuming her role as mother. ([*Id.* at] 70; Concise Statement [at ¶] 2). Thus, the true obstacle in this case was [Mother's] choice to prioritize favorable resolution of her criminal matters over pursuing a place of importance in [Child's] life, which obstacle was of [Mother's] own making.

Even if the court were inclined to merit [Mother's] "plan of attack as obstacle" argument, that argument was gutted by the fact that after [Mother's] criminal case eventually concluded in a favorable plea agreement in mid-2022, [Mother] still did not file a child custody action or otherwise pursue a place of parental importance in [Child's] life until she was forced to defend herself in this action initiated by [Father] more than six months after her plea and sentencing. [Mother] tried to justify her inaction by asserting variously that she could not afford custody litigation ([*id.* at] 64-65, 71); she believed the PFA prevented her from pursuing custody ([*id.* at] 61-62); she was told by countless unidentified attorneys that she could file for custody while the PFA Order was pending, but only with the assistance of an attorney ([*id.* at] 64-65), which circled back to she could not afford legal counsel, and that basically the best solution for her would be to wait until the PFA Order expired before filing for custody. (*Id.*) The trial court considered all of [Mother's] excuses, but did not find any of them to be valid.

While surely custody litigation can be expensive, [Mother] made no effort to explain why she was not able to amass sufficient funds to pursue custody over the course of two-plus years, yet was able to retain private counsel for the [termination] hearing. The court does not believe that several local attorneys told [Mother] she could not pursue a custody action *pro se*, as such advice would be untrue and unethical. Self-represented parties are commonplace in Erie County family court, as all members of the family bench and bar are aware, and user-friendly forms and instructions are readily available on Erie County's Custody Conciliation public web page.

Based on the totality of [Mother's] testimony, the trial court

- 11 -

concluded that [Mother's] delay in filing a custody action for over six months prior to the [termination] petition, as well as her absence from [Child's] life for over [28] months, were not occasioned by any insurmountable obstacle, but rather were the result of [Mother's] considered choice to put her legal and financial interests ahead of her responsibility to parent [Child]. Thus, even if the court were to believe that [Mother] sincerely planned to return to fully performing parental duties at some point in the future, when her legal and financial circumstances were more suitable, "the court cannot and will not subordinate indefinitely the Child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006)….

Regarding [Mother's] companion assertion that the trial court failed to consider her efforts to overcome the aforementioned obstacles, and leaving aside the fact that the trial found that there were no insurmountable obstacles—especially during the six months preceding the filing of the [termination] petition, the trial court did not find any of [Mother's] alleged efforts to be either credible or sufficient, for all of the reasons stated above. Specifically regarding the parenting and anger management courses referenced in her Concise Statement, she admitted that those were completed as part of her plea deal in July of 2022 ([N.T. Hearing at] 62), so even if she intended for them to double as proof of "efforts to overcome parenting obstacles," the remoteness in time and lack of sustained effort thereafter rendered them inconsequential in these proceedings.

Also, the trial court did not credit [Mother's] argument that [Father] is to blame for her absence from [Child's] life for over [28] months. In her Concise Statement, [Mother] argues: "Father neglected to contact Mother about any counseling or therapy appointments to allow her to be a part of the treatment for the outbursts or behavioral problems with the Child, and thus, deprived Mother the opportunity for a behavioral health professional…to evaluate the relationship between Mother and son. Father has failed to update Mother on anything regarding the Child, and thus, manufactured a hardship for Mother to be present and involved in Child's life." (Concise Statement [at ¶] 7). This

argument appears to suggest that [Father] had an affirmative duty to provide unsolicited parenting information to Mother. There was no custody order in place at the time the PFA Order was entered. One could argue that it would have been desirable for [Father] to volunteer information about [Child], but he was under no legal obligation to do so.

[Mother] knew she was not receiving information about [Child's] health and well-being for over [28] months, and knew she could file a custody action to pursue involvement in [Child's] life, but she elected not to do so in order to protect her own legal and financial interests. Accordingly, the record supports the trial court's conclusion that [Mother] failed to exercise reasonable firmness in resisting obstacles, actual or perceived, placed in the path of maintaining the parent-child relationship, such as the alleged obstacle created by [Father's] silence.

(Trial Court Opinion at 7-11).

The record supports the trial court's determination. The court considered Mother's circumstances and explanations before it determined that involuntary termination was warranted. *See In re B., N.M., supra*. Likewise, the record supports the court's credibility determinations, which we will not disturb. *See Adoption of C.M., supra*. As the trial court observed, Mother prioritized resolving the criminal charges against her before seeking custody of Child. We agree with the trial court that any obstacles posed by either the PFA or her financial difficulty in hiring counsel to represent her in a custody action were not insurmountable. On this record, we see no abuse of discretion concerning the court's decision that Mother failed to perform parental duties under Section 2511(a)(1).

In her final issue, Mother argues that Child's behavioral issues did not

manifest when he was in her custody early in his life, and Mother suggests that it is possible that Child "has an attachment disorder and is in dire need of an opportunity to be with his Mother." (Mother's Brief at 18). Mother asserts that Colleen Pritty, Child's blended case manager, stated that she could not rule out that a potential relationship with Mother may aid in Child's long term well-being. (*Id.* (citing N.T. Hearing at 86)). Mother concludes that it was not in Child's best interests to terminate Mother's parental rights, and this Court must grant relief. We disagree.

With respect to Section 2511(b), we consider whether termination of parental rights will best serve Child's developmental, physical and emotional needs and welfare. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010). "[A] parent's basic constitutional right to the custody and rearing of...her child is converted, upon the failure to fulfill...her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (internal citations omitted).

"In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121. "When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation."

*Id.* (internal citations omitted). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have…her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [herself] to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances. A

- 15 -

parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with…[his] physical and emotional needs.

*In re B.N.M., supra* at 855 (internal citations omitted).

Instantly, at the termination hearing, Attorney Heasley called Colleen Pretty, Child's blended case manager, as a witness. Ms. Pretty explained that she started working with Child in November 2022 to receive services for some behavioral concerns. Ms. Pretty testified that Child knows that he has a biological mother, but he refers to Stepmother as "mom." (N.T. Hearing at 82). Ms. Pretty described a significant bond between Child and Stepmother and explained that she is patient and proactive with his treatment. As a result, Ms. Pretty explained that Child is progressing in his treatment. (*Id.* at 82-83). Ms. Pretty opined that if Mother were introduced into his life at this point, it would require intensive therapy and a significant amount of difficult work for Child to re-establish a relationship with her. (*Id.* at 80).

After considering all of the testimony and evidence introduced at the hearing, the trial court found that Father met his burden of proving that termination of Mother's parental rights was in Child's best interests under Section 2511(b). The court noted that "[t]hough the testimony at the [termination] hearing supported [Mother's] contention that she once shared a significant parental bond with [Child], it also revealed that [Child] no longer

recognizes [Mother] as a true mother figure." (Trial Court Opinion at 12). The court found credible Ms. Pretty's opinion that Child would likely require "intensive therapeutic support over an extended period of time to successfully adjust to [Mother's] reappearance in his life as a mother figure after having no contact with her for nearly three years, and after having understandably replaced [Mother] with [Stepmother] as a mother figure." (**Id.**) (record citations omitted).

Upon review, we conclude that the record supports the court's findings. Child has been removed from Mother's care for years, during which time he has bonded with Stepmother, who initiated the instant adoption action. On this record, we cannot say that the court erred or abused its discretion in finding that termination is in Child's best interests under Section 2511(b). Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/05/2024